UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEAR, LLC, a Minnesota limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>MARINE GROUP BOAT WORKS, LLC, a California limited liability company; UNIVERSAL STEEL FABRICATION, INC., a California corporation,<br><br>Defendant. | Case No.: 14-cv-2960-BTM-BLM<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 90.]** |

On November 4, 2016, Defendant Marine Group Boat Works, LLC ("MGBW") filed a motion for summary judgment. (MGBW Mot. Summ. J. ("MGBW's MSJ"), ECF No. 90.) For the reasons discussed below, the motion is denied.

## I. FACTUAL BACKGROUND

In April 2014, Captain Roger M. Trafton ("Trafton") of Plaintiff Bear, LLC's ("Bear") 102-foot motor vessel ("the *Polar Bear*") scheduled a maintenance visit for the *Polar Bear* at MGBW. (Decl. of Scott Sokul, in Supp. of MGBW's MSJ Ex.

("MGBW's Ex.") 3, ECF No. 90–8, 164:8–165:16.) On May 6, 2014, while on its way to San Diego, the *Polar Bear* struck the submerged Zuniga Jetty at the entrance to the San Diego Harbor, damaging the bottom of the hull and causing water to leak in. (Id. at 153:16–19; 169:10–21.) Trafton navigated the *Polar Bear* under its own power to the San Diego U.S. Customs dock where two divers inspected the hull of the boat and determined that a stabilizer had been damaged. (Id. at 174:1–177:10.) The divers packed the stabilizer opening, which stopped the ingress of water into the hull. (Id. at 177:11–178:15.)

Under its own power, the *Polar Bear* traveled from the U.S. Customs dock to MGBW's shipyard. (Id. at 179:16–19.) As a safety measure, the *Polar Bear* was accompanied by two small towboats. (Id. at 179:16–23.) The *Polar Bear* arrived at MGBW on May 7, 2014. Upon arriving at MGBW, the *Polar Bear* was placed in lifting slings and positioned to be lifted out. (MGBW's Ex. 5, ECF No. 90–10, 707:20–711:4.) Trafton disembarked the *Polar Bear* and went to the MGBW office while Larry Jodsaas, Bear's sole member, remained on the vessel. (MBGW's Ex. 3 191:5–7; 196:15–18.) Once at the office, a MGBW receptionist handed Trafton a standard MGBW work order contract ("Contract") to sign on a clipboard. (Id. at 192:1–193:17.) The front side of the Contract listed the work that MGBW was to perform, while the back side contained the terms and conditions. (MGBW's Ex. 16, ECF No. 90–21.) Trafton read the front side of the Contract and signed it on behalf of Jodsaas. (MGBW's Ex. 3 130:14–24.) Trafton did not read the back side that detailed the terms and conditions. (Id. 131:1–4.) The Contract describes the scope of the work as: "Haul Out, Block & Launch" and "Lay days charged at $2.00 per ft./per day. No charge for day of haul and day of launch." (MGBW's Ex. 16, 2.) Just above the signature line, the front side of the Contract states: "I hereby authorize the above repair work to be performed. I acknowledge that I have received a copy of, and have read, understood and agree to the terms and conditions of this Contract, including those on the reverse side hereof." (MGBW's

Ex. 16, 2.) The back side contains several provisions limiting MGBW's liability that state in relevant part:

> THIS AGREEMENT, consisting of this Work Order ("Order"), is entered into between Marine Group Boat Works, LLC, ("Contractor") a California limited liability company, the Owner identified on the reverse thereof, ("Owner"), and the therein named vessel ("the Vessel"), on the following terms and conditions.
>
> 1. <u>STATEMENT OF WORK</u>.
> Contractor agrees to furnish materials, parts, supplies, and labor to perform the work described in the Order (hereinafter "Work"). Owner has specifically requested the Work set forth in the Order, shall inspect the progress of the Work from time to time as he deems necessary, and has satisfied himself as to the suitability for his intended purposes of all machinery, parts, equipment, supplies and accessories to be installed pursuant to this Agreement.
>
> 3. <u>WARRANTY EXCLUSIONS</u>.
> THE WARRANTIES SET FORTH IN PARAGRAPH 2 ARE GIVEN IN LIEU OF ALL OTHER WARRANTIES, WHETHER EXPRESSED, IMPLIED OR STATUTORY, CONTRACTOR DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, THAT THE MATERIALS ARE MERCHANTABLE OR FIT FOR ANY PARTICULAR USE OR PURPOSE.
>
> 8. <u>OWNERS ASSUMPTION OF RISK</u>.
> (a) Except as provided in paragraphs 2 and 6 above, Owner accepts the risk of all losses hereafter occasioned by the acts or omissions of the Contractor in the performance of the Work, whether in the nature of negligence, strict liability, or otherwise, and agrees to purchase and maintain such insurance against such risks as Owner deems prudent and shall look only to said insurance for compensation or damages related to any such loss regardless of the legal or physical responsibility thereof, subrogation against Contractor is hereby waived.
> (b) Owner accepts the risk of, and Contractor shall have no legal liability whatsoever, under any circumstances for, the tortuous or criminal acts of any third party, included but not limited to theft, conversion, and malicious mischief.
>
> 9. <u>FINANCIAL LIMITATION</u>.
> In no event shall Contractor's aggregate liability to all parties in interest

arising under this Agreement or the Work for all damages, including, but not limited to, any tort damages, exceed $25,000 or the sum received by Contractor under this Agreement, whichever is less.

10. <u>INDEMNITY, INSURANCE AND WAIVER OF SUBROGATION.</u>
(a) Owner shall indemnify and hold Contractor harmless of any claim, loss, cost, liability or expense, including reasonable attorney's fees incurred in defense thereof, arising from the intentional or negligent acts or omissions or Owner or his agents, employees or independent contractors, or the failure of Owner of his agents, employees or independent contractors to comply with the provisions of this Agreement. Said indemnification shall encompass and include any and all claims by third parties arising under this Agreement or the Work performed hereunder, except claims by employees, subcontractors or vendors of Contractor for goods, services or employee benefits, as the case may be.
(b) During the period the Vessel is present in Contractor's boatyard or other place or repair agreed to between Contractor and Owner, Owner shall purchase and maintain such types and amounts of insurance as Owner deems reasonable and prudent to protect against risks assumed by Owner under this Agreement. As to all such policies or insurance and all claims made thereon, for himself and his insurers, Owner specifically waives all right of subrogation against Contractor, its subsidiaries, affiliates, agents, officers, directors and employees.

(Id. at 3.) (typographical errors in original)

After Trafton signed the Contract, the *Polar Bear* was hauled out of the water and set on blocks in the yard where it remained until the fire. (Decl. of Eric Lundeen, in Supp. of MGBW's MSJ, ECF No. 90–2, ¶ 7.) From May 22, 2014 through early June, 2014, Trafton executed numerous separate work change orders for repairs to the *Polar Bear*, including a May 22, 2014 order ("Change Order 1002") for the removal of lead ballast and foam in the work space and hot work repairs to the hull. (MGBW's Ex. 11–13, ECF Nos. 16–18.) Each change order specified that it was in addition to the original Contract, which would remain otherwise unchanged and in full force and effect. (MGBW's Ex. 11, 2.)

On June 18, 2014, MGBW obtained a hot work permit authorizing hot work

to be performed on June 19, 2014. (MGBW's Ex. 29, 62:19–64:6.) On June 19, 2014, the *Polar Bear* caught fire while welders of Universal Steel Fabrication, Inc. ("USF"), a subcontractor hired by MGBW, were performing hot work. (Decl. of Todd Roberts, in Supp. of MGBW's MSJ, ECF No. 90–4, ¶¶ 9–10.) The fire resulted in the destruction of the *Polar Bear*. (Id.)

On December 16, 2014, Bear filed this action against MGBW, alleging six causes of action: (1) Breach of Contract; (2) Negligence; (3) Gross Negligence; (4) Breach of Implied Warranty of Workmanlike Performance; (5) Breach of Bailment; and (6) Fraud. (Compl. ECF No. 1.)

## **II. STANDARD**

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 323 (1986).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. Id. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec.*

*Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to demonstrate that a genuine issue of disputed fact remains. *Celotex*, 477 U.S. at 314. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." Anderson, 477 U.S. at 256. Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

**A. Applicable Law**

This action arises out of a marine ship repair contract. The Contract's choice of law provision indicates that it should be "construed and interpreted in accordance with the admiralty and maritime law of the United States." (MGBW's Ex. 16.) It has long been established that a contract for ship repairs is a maritime contract. *New Bedford Dry Dock Co. v. Purdy*, 258 U.S. 96, 99 (1922). Maritime contracts are governed by federal maritime law. *Norfolk S. Ry. v. James B. Kirby, Pty Ltd.*, 543 U.S. 14, 23 (2004). Additionally, the Ninth Circuit has held that "[b]asic principles in the common law of contracts readily apply in the maritime context." *Clevo Co. v. Hecny Transp., Inc.*, 715 F.3d 1189, 1194 (9th

Cir. 2013). Accordingly, the Contract and Bear's claims for breach of contract, breach of implied warranty, and breach of bailment agreement are governed by federal maritime law.

Bear's tort claims, on the other hand, are governed by California state law. *Sentry Select Ins. Co. v. Royal Ins. Co. of Am.*, 481 F.3d 1208, 1220 (9th Cir. 2007) (applying Washington law to an ancillary misrepresentation claim); *Royal Ins. Co. of Am. V. Sw. Marine*, 194 F.3d 1009, 1015 (9th Cir. 1999) (applying California law to a gross negligence claim against a shipyard).

**B. Enforceability of Exculpatory Clauses**

MGBW moves for summary judgment on Bear's first, second, fourth and fifth claims, arguing that certain provisions in the Contract bar these claims. Bear argues that the provisions are unenforceable because they are against public policy.

It is well-settled in admiralty law that the parties to a repair contract may validly stipulate that the ship owner is to assume all liability for *all* damage occasioned by the negligence of the shipyard. *M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1488 (9th Cir. 1983). The Ninth Circuit has repeatedly held that these exculpatory provisions do not violate public policy, and absent evidence of overreaching, upholds these provisions as a means to give effect to the expressed intent of the parties. *Id.*; *Sw. Marine*, 194 F.3d at 1014; *Morton v. Zidell Explorations, Inc.*, 695 F.2d 347, 351 (9th Cir. 1982).

**1. No Evidence of Overreaching**

Bear argues that the exculpatory provisions in the Contract cannot be upheld because MGBW overreached when Trafton executed the Contract. While the Ninth Circuit has held that exculpatory clauses will not be enforced if there is evidence of overreaching, the Court does not find that MGBW overreached in this case. *See Am. Queen*, 708 F.3d at 1488.

Bear contends that because only MGBW has a boat lift with sufficient

7

14-cv-2960-BTM-BLM

capacity to haul out yachts of the *Polar Bear*'s size, it holds a monopoly that prevents equal bargaining power. It argues that under the circumstances, namely the fact that water was leaking into the *Polar Bear*, Trafton had no choice but to sign the Contract and undertake repairs. However, the parties do not dispute that the *Polar Bear* was already on its way to MGBW for regular maintenance when it ran aground at the entrance of the San Diego Harbor. Bear had already intended to Contract with MGBW for its services. Additionally, Trafton signed Change Order 1002 more than two weeks after the *Polar Bear* ran aground. Trafton negotiated over emails how the work was to be performed, which demonstrates his ability to negotiate the terms of the Contract. Moreover, Paragraph 5 of the Contract explicitly provides that the parties may negotiate, for a different price, and increase MGBW's liabilities. It provides:

> The Contract Price is based upon the provisions of this Agreement limiting the scope and duration of Contractor's warranties, limiting Contractor's liability and under which Owner accepts certain risks. Contractor is willing to perform the Work on the Vessel on the basis of different or more extensive liabilities or warranties provided an adjustment in price, including the price of appropriate additional insurance is signed by the parties and incorporated into this Agreement. Barring such further agreement and adjustment of the Contract Price, the warranty and limitations of the Contractor's liability and Owner's acceptance of risks as set forth in this Agreement shall apply.

(MGBW's Ex. 16, 3.)

The parties do no dispute that Trafton did not read or object to the exculpatory provisions when he signed the Contract or the subsequent change work orders. The Ninth Circuit has refused to invalidate exculpatory provisions in a ship repair contract where the ship owner "assented without complaint to the terms of the agreement." *Royal Ins. Co. of Am.*, 194 F.3d at 1015; *see also Am. Queen*, 708 F.3d at 1488; *see also Morton*, 695 F.2d at 351. Bear argues that Trafton was not provided with reasonable notice as to the existence of the

exculpatory provisions and therefore could not have objected to the Contract's terms. Bear relies on the Ninth Circuit's "reasonable communicativeness" test to argue that MGBW failed to reasonably communicate its terms and conditions or allow Bear to meaningfully assent to them. *See Wallis ex rel. Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 836 (9th Cir. 2002) (applying the "reasonable communicativeness" test to determine under common law and maritime law when the passenger of a common carrier is contractually bound by the fine print of a passenger ticket). However, Bear fails to cite any authority that applies this test to ship repair contracts between a vessel owner and a shipyard. Notwithstanding the lack of authority, the undisputed facts indicate that the Contract provided Trafton with notice of the exculpatory provisions. The front side of the Contract signals the reader to "see reverse for details." (MGBW Ex. 16, 2.) Though Trafton did not initial the back-side of the Contract, by signing the front-side, he certified that he understood the terms and conditions, including those on the reverse side of the Contract. (Id.)

Because there is no evidence that MGBW overreached in procuring the Contract, the Court will honor the expressed intent of the parties. *See Am. Queen*, 708 F.3d at 1489 (finding provision in ship repair contract that explicitly provided that the parties may negotiate the ship yard's liability as evidence of no overreaching).

**C. Application of the Exculpatory Provisions**

Having found no evidence of overreaching, the Court now turns to whether the exculpatory provisions apply to Bear's claims.

"Clauses that purport to limit a party's legal responsibility are strictly construed and to be given effect must clearly express the intention of all parties whose liability is altered by the agreement." *Bosnor, S.A. de C.V. v. Tug L.A. Barrios*, 796 F.2d 776, 781 (9th Cir. 1986). Here, the exculpatory provisions do not apply to Bear's claims because it is clear from the Contract that the parties

intended to only limit liability for MGBW's *own* performance of the work. The Contract, which contains the exculpatory provisions that MGBW relies upon, is an agreement between Bear and MGBW for the hauling, blocking, and storing of the *Polar Bear*. At the time they entered into the Contract, it was clear that MGBW would perform that work. Therefore, the entire Contract, including the exculpatory provisions, is predicated on the agreement that MGBW would perform the work authorized by Bear. A close reading of the Contract reflects the parties' intent.

Paragraph 1 states that the "Contractor agrees to furnish materials, parts, supplies and *labor to perform the work* described in the order." (MGBW's Ex. 16, 3.) While this statement can theoretically be interpreted to mean that it will furnish labor via subcontractors, the Court is required to strictly construe these provisions. Thus, Paragraph 1 clearly evidences the parties' intent that MGBW would perform the work. Similarly, Paragraph 5, which explains that the Contract price is based on MGBW's limited liability, provides that the "*Contractor is willing to perform* the Work on the Vessel on the basis of different or more extensive liabilities or warranties provided an adjustment in price . . . ." (Id.) It is clear from this statement that MGBW's limited liability depends on its own performance of the work described under the Contract.

Additionally, Paragraph 8, which MGBW argues exculpates it from liability, states that the "Owner accepts the risk of all losses hereafter occasioned by the acts or omissions of the Contractor *in the performance of the Work* . . . ." (Id.) It is undisputed that USF, not MGBW, performed the hot work under Change Order 1002. USF's performance of the "Work" is therefore beyond the risk that Bear agreed to assume. In an attempt to avoid this provision's implications, MGBW argues that the loss did arise out of the "Work" because the loss occurred while the *Polar Bear* was hauled out, blocked, and incurring lay day fees. However, the loss of the *Polar Bear* did not occur as a result of the performance of *that*

work. It instead arose out of the direct the performance of the hot work authorized under Change Order 1002. MGBW argues that neither the Contract nor Change Order 1002 state that the work shall only be performed by MGBW. However, what this argument ignores is that the original Contract is for MGBW to haul, block, and store the *Polar Bear*. While Change Order 1002 amends the type of work authorized by Bear, it in no way changes what party was originally agreed upon to perform the work[1]. The fact that Change Order 1002 makes no mention of a subcontractor performing the work implies that it stands by the original Contract, which provides for MGBW to perform the work.

Moreover, Paragraph 9, which MGBW argues limits liability to $25,000, states that "[i]n no event shall [MGBW's] aggregate liability to all parties in interest *arising under this Agreement or the Work* . . . exceed $25,000." (Id.) Paragraph 9 depends on the agreement that MGBW would haul, block and store the *Polar Bear*. Thus, it necessarily follows that the provision limits MGBW's liability as to its own performance of the work. Paragraph 10(b) is also conditioned on the "risk assumed by [Bear] under this Agreement." (Id.) Under the Contract, the risk that Bear was willing to undertake was MGBW's performance of the work. The agreement the parties entered into did not contemplate any other party performing the work.

As Bear notes, MGBW understood how to limit its liability as it related to subcontractors. Paragraph 10(a) explicitly states that Bear will indemnify and hold MGBW harmless for all claims arising from the negligent or intentional acts of Bear's own agents or subcontractors. Indeed, when the Contract speaks of a party other than MGBW performing the work, it is when the Contract limits Bear's own ability to perform the work. Paragraph 17 states that "[n]either [Bear], nor

---

[1] Change Order #1002 states: "Except as expressly amended hereby and by any previous change order itself not specifically amended hereby, the Contract referred to above shall remain unchanged and in full force and effect." (MGBW's Ex. 11.)

11

any contractor or subcontractor engaged by Owner, shall perform any work on the Vessel at the facilities of [MGBW] unless Owner has entered into a separate "Do-it-Yourself" contract with Contractor." (Id.)

The Court's interpretation of the Contract is reinforced by the rationale behind upholding these exculpatory provisions. The idea that parties can allocate their own risks, including those arising out of negligent acts, "is predicated on the consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational distribution of the risk than the law would otherwise allow." *Jig The Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171, 176 (5th Cir. 1975), *overruled on other grounds by E. River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858 (1986). The redistribution of risk only makes sense if a party fully understands what kind of risk it is agreeing to assume, which requires an assessment of the party that is performing the work, as well as the type of work being performed. Here, it would be contrary to the rationale behind maritime exculpatory clauses to hold that the parties intended for Bear to assume a risk of another service provider to which it had not agreed.

With that in mind, the Court finds that the exculpatory provisions in the Contract only apply if MGBW performed the work. Because it is undisputed that it did not, Bear's claims are not barred or financially limited.

Alternatively, as discussed below, the Court holds that Bear's claim of promissory fraud is a triable issue. If Bear prevails at trial on this claim, a finding of fraud would void the Contract. Therefore, the exculpatory provisions cannot be enforced at this stage. Accordingly, MGBW's motion for summary judgment as to Bear's first, second, fourth and fifth claims is denied.

**D. Breach of Bailment**

"A bailment relationship arises when goods are delivered by one party to another for a specific purpose, and the other party accepts the goods with the

express or implied promise that the goods will be returned after the purpose of the delivery has been fulfilled." Benedict on Admiralty, Vol. 8, § 19.07 (Matthew Bender). It is well-settled that "bailment law is applicable to suits for damages to or loss of a vessel that has been left with another for purpose of repair." *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 924 F.2d 16, 18 (1st Cir. 1991); *see also Lake Union Dry Dock & Machine Works v. United States*, 79 F.2d 802 (9th Cir. 1935); *see also Buntin v. Fletchas*, 527 F.2d 512, 513 (5th Cir. 1958); *see also Muller Boat Works, Inc. v. Unnamed 52' House Barge*, 464 F. Supp. 2d 127, 146 (E.D.N.Y. 2006).

MGBW relies on *Man Ferrostaal, Inc. v. M/V Akili*, 704 F.3d 77 (2d. Cir. 2012) and *QT Trading, L.P. v. M/V Saga Morus*, 641 F.3d 105 (5th Cir. 2011) to move for summary judgment on Bear's fifth cause of action. It argues that Bear's claim fails because it cannot establish that MGBW had "exclusive possession" of the *Polar Bear*. While these cases do state that a claim of bailment requires proof of "exclusive possession," their facts are dissimilar to this case. *QT Trading*, 641 F.3d at 111 ("[a] claim of bailment does not arise under admiralty law unless: (1) delivery to the bailee is complete and (2) he has exclusive possession of the bailed property, even against its owner.") (internal citations omitted); *Man Ferrostaal*, 704 F.3d at 88 ("bailment does not arise unless delivery to the bailee is complete and he has exclusive possession of the bailed property."). The cases do not involve suits against shipyards for a breach of bailment after the delivery of a vessel for repair or dry dock. Instead they involve actions against ship owners for damaged cargo that charterers were in possession of. *Q.T. Trading*, 641 at 111; *Man Ferrostaal*, 704 F.3d at 89. It is within that context that the Second and Fifth Circuits have required proof that the bailee had "exclusive possession" of the delivered property. Thus, the Court is reluctant to apply them to Bear's claim for breach of bailment. *See Frichelle LTD v. Master Marine, Inc.*, 99 F. Supp. 2d 1337 (2000) (providing an overview of the

cases that require a showing of "exclusive possession" and distinguishing them from cases that involve the delivery of a vessel to a dry dock for repair).

A review of bailment law as it applies to shipyards reveals that a non-exclusive right and possession does not, as matter of law, preclude a bailment from being established. *See Goudy & Stevens*, 924 F.2d at 18–19 (that bailor's agent remained on the vessel and served as a repairman himself merely precluded the presumption of negligence from arising, not the bailment relationship altogether); *see also Pan-Am. Petroleum Tr. Co. v. Robins Dry Dock & Repair Co.*, 281 F.97 (2d. Cir. 1922) (that agents for the bailor were on board at the time the damage occurred did not change the fact that the bailee had exclusive possession of a vessel under a contract for repairs); *see also Muller Boat Works, Inc.*, 464 F. Supp. 2d at 147 (shifting the burden of production to bailee even though bailors accessed the vessel while it was at bailee's shipyard).

The First Circuit in *Goudy & Stevens, Inc.*, explained a bailor's burden of proof:

> [W]hen the bailor shows delivery to a bailee and the bailee's failure to return the thing bailed, he makes out a *prima facie* case of negligence against the bailee, and it then becomes the duty of the bailee to come forward with the evidence to explain its default by showing facts and circumstances sufficient in law to exonerate it from liability for the damage. The rationale for such an inference of negligence is a sound one: since the bailee is generally in a better position than the bailor to ascertain the cause of the loss, the law lays on it the duty to come forward with information it has available. . . . [N]o inference or presumption of negligence can arise against a bailee if its possession of the damaged bailed property was not exclusive of that of the bailor. We add that the fact that the bailee's possession over the thing bailed must be exclusive for the preemption to apply does not mean that any act of dominion by the bailor over the vessel would also negate the inference. Rather, it implies that possession and control must be of such a nature as to permit a reasonable trier of fact to infer that the bailee is in the better, or sole, position to explain what actually happened.

924 F.2d at 18–19 (internal citations omitted).

Therefore, despite the undisputed evidence that Trafton was living on board the *Polar Bear* and participated in some repair work, it does not preclude Bear's bailment claim. As the case law states, it at best precludes a presumption of negligence from arising. Accordingly, MGBW's motion is denied as to Bear's bailment claim.

**E. Gross Negligence**

The Ninth Circuit has consistently held that exculpatory provisions do not shield parties from liability for gross negligence or intentional misconduct. *Royal Ins. Co. of Am.*, 194 F.3d at 1016 ("a party to a maritime contract should not be permitted to shield itself contractually from liability for gross negligence . . . and from liability for intentional misconduct."). California law defines "gross negligence" as the "intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another; such a gross want of care and regard for the rights of others as to justify the presumption of willfulness and wantonness." *Id.* at 1015. The Ninth Circuit has indicated that "gross negligence is a point on a continuum of probability, and its presence depends on the particular circumstances of each case." *Id.* (internal citations omitted).

Here, the parties dispute whether MGBW's conduct constitutes gross negligence. MGBW argues that it made significant attempts to comply with applicable standards and regulations. It submits evidence to demonstrate that it had a fire prevention program in place and held numerous safety meetings with USF. (MGBW's Ex. 26, ECF No. 90–31, 87–89; Ex. 27, ECF No. 90–31, 233:10–236:19.) It also presents evidence that on the day of the fire, it had a "competent person" inspect the area for welding and issue a hot work permit. (MGBW's Ex. 29, ECF No. 90–34, 70:6–72:2; 74:14–76:9; 79:1–8.) In response, Bear submits evidence to argue that MGBW failed to supervise its subcontractors

//

and ensure fire safety, as well as issued "hot work" permits in violation of industry custom and its own written standards. (Decl. of Robert Wright, in Supp. of Bear's Opp'n Ex. ("Wright's Ex.") E, ECF No. 93–3, 57:9–25; 191:21–192:4; 201:14–23; Wright's Ex. G, ECF No. 93–7, 224:15–25; 234:2–235:18; Wright's Ex. K, ECF No. 93–9, 18:8–21:17; 29:15–34:16; 36:13–37:7; Decl. of Troy Corbin, in Supp. of Bear's Opp'n, ECF No. 93–37, ¶¶ 19, 33, 53–61.) These arguments and evidence create an issue of material fact. When viewed in the light most favorable to Bear, a rational trier of fact could conclude that MGBW's actions or omissions constituted gross negligence. Accordingly, the issue of gross negligence cannot be disposed of on summary judgment.

**F. Promissory Fraud**

Bear alleges that MGBW committed promissory fraud by representing to Trafton, prior to him approving Change Order 1002, that MGBW would personally perform the repairs.

"An action for promissory fraud may lie where a defendant fraudulently induces a plaintiff to enter into a contract." *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (Cal. App. Ct. 1996). The elements that give rise to the tort of promissory fraud are: "(1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promise[e]." *Behnke v. State Farm Gen. Ins. Co.*, 196 Cal. App. 4th 1443, 1453 (Cal App. 2011).

MGBW moves for summary judgment on this claim, arguing that Bear cannot establish that Eric Lundeen ("Lundeen"), an MGBW director of projects, knew at the time of his conversation with Trafton that MGBW intended to have the work performed by third parties.

Bear has submitted evidence that on May 14, 2014, Lundeen emailed Trafton two quotes for the hot work at issue in Change Order 1002. (Decl. of Roger Trafton, in Supp. of Bear's Opp'n, Ex. ("Trafton's Ex.") J, ECF No. 93–13.) One quote was from a subcontractor for $110,000 and the other was from MGBW for $140,000. (Id.) According to Trafton, within the next couple of days, he communicated to Lundeen that he and Jodsaas wanted to move forward with MGBW's quote, because Jodsaas was adamant about not using subcontractors. (Trafton Decl. ¶ 93.) A day later, on May 15, 2014, Trafton communicated with Todd Roberts ("Roberts") from MBGW about the final proposed price for the hot work that MGBW would perform. (Trafton's Exs. K, L, ECF Nos. 93–25, 26.) On May 22, 2014, Trafton approved Change Order 1002, which incorporated their communications about the work to be done and final agreed upon price of $169,233.00. (Trafton's Ex. M, ECF No. 93–27.) Bear also submits the testimony of Ryan McAloney, a MGBW project manager, that it was "common knowledge that [MBGW] was too busy at the time to do the work." (Wright's Ex. H, ECF No. 93–7, 96:1–97:1.)

Viewing all inferences drawn from these facts in the light most favorable to Bear, there remain, at the very least, genuine disputes of material fact as to Lundeen's intent to not perform and deceive. Therefore, MGBW's motion is denied as to Bear's promissory fraud claim.

**G. Remaining Issues**

**1. Evidentiary Objections**

Both parties raise objections to several declarations and exhibits submitted in support of the opposing parties' papers. Having reviewed the parties' objections, the Court rules as follows:

- MGBW's Objection 1 to Troy Corbin's Declaration is overruled.

Because the Court did not rely on the remaining materials in reaching its decision, it overrules those objections as moot.

**2. Bear's Request for Judicial Notice**

Along with its Opposition, Bear filed a request for judicial notice. (ECF No. 93-54.) The Court denies Bear's request as moot.

**3. Bear's Motion for Leave to File an Oversized Brief**

On December 23, 2016, concurrently with its papers, Bear filed a motion for leave to file an oversized opposition brief. (ECF No. 92.) On December 27, 2014, MGBW opposed Bear's motion. (ECF No. 94.) The Court grants Bear's motion.

## IV. CONCLUSION

For the reasons discussed above, MGBW's motion for summary judgment (ECF No. 90) is **DENIED.** Bear's motion for leave to file an oversized (ECF No. 92) is **GRANTED**.

**IT IS SO ORDERED.**

Dated: May 5, 2017

_____
Barry Ted Moskowitz, Chief Judge
United States District Court